| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | WESTERN DISTRICT OF MISSOURI |
| 2 | |
| 3 | STECKLEIN & RAPP CHARTERED, |
| 4 | Plaintiff,       Docket No. 4:23-mc-09003 |
| 5 | v. |
| 6 | EXPERIAN INFORMATION     Kansas City, Missouri |
| | SOLUTIONS, INC.,     April 5, 2023 |
| 7 | |
| | Defendant. |
| 8 | ......................... |
| | TRANSCRIPT OF DISCOVERY HEARING - REDACTED |
| 9 | BEFORE THE HONORABLE ROSEANN KETCHMARK |
| | UNITED STATES DISTRICT JUDGE |
| 10 | |
| 11 | APPEARANCES: |
| 12 | For the Plaintiff:     Mr. Daniel L. McClain |
| |     Mr. Cody R. Weyhofen |
| 13 |     Seigfreid Bingham, PC |
| |     2323 Grand Boulevard |
| 14 |     Suite 1000 |
| |     Kansas City, Missouri 64108 |
| 15 | |
| 16 | For the Defendant:     Mr. David Sandefer |
| |     Jones Day |
| 17 |     110 North Wacker Drive |
| |     Suite 4800 |
| 18 |     Chicago, Illinois 60606 |
| 19 |     Mr. G. Edgar James |
| |     James Sobba, LLC |
| 20 |     4435 Main Street |
| |     Suite 910 |
| 21 |     Kansas City, Missouri 64112 |
| 22 | Proceedings recorded by machine shorthand.  Transcript |
| | produced by computer-aided transcription. |
| 23 | _____ |
| | Jean M. Crawford, RDR, CRR |
| 24 | United States Court Reporter |
| | 400 East Ninth Street, #8420 |
| 25 | Kansas City, Missouri 64106 |
| | 816.512.5642 |

1          (Proceedings commenced at 1:51 PM)

2          THE COURT:  Good afternoon.  Today is April 5th,

3    2023, approximately 1:50 in the afternoon.  And the Court is

4    calling case number 23-9003, Stecklein & Rapp Chartered versus

5    Experian Informations Solutions, Inc.  Could I have entry of

6    appearances first by plaintiff.

7          MR. MCCLAIN:  Good afternoon, Your Honor.  It's Dan

8    McClain on behalf of the plaintiff.  Also with me is Cody

9    Weyhofen, my law firm.  We also have here today Matt Robertson.

10   He's a lawyer with Stecklein & Rapp Chartered.  He's counsel

11   for Mr. and Mrs. Dulworth in the underlying case in Indiana.

12         THE COURT:  All right.  And if you want him to come

13   sit at counsel table, he can pull up a chair if he needs to

14   serve as your resource for any purpose.

15         All right.  And entry for defendant, please.

16         MR. JAMES:  Your Honor, Eddie James from the law

17   firm of James Sobba for Experian Information Solutions.  And I

18   have with me David Sandefer from the law firm of Jones Day.

19   And Mr. Sandefer will be presenting argument to the Court

20   today.

21         THE COURT:  Very good.  Welcome.

22         All right.  So on the agenda today is the motion to

23   quash.  I have been out of town until today, so my clerk gave

24   me a heads up last week.  Sorry for coming in late, but I did

25   want to read, in particular, the deposition of Ms. Dulworth to

1   the extent it was supplied to the Court.  And I can tell you

2   kind of where my mind is before we get started so that you can

3   make corrections or tailor my thinking more succinctly to your

4   issue.

5           So the point is that the discovery is requested to

6   determine what level of participation or role the Dulworths

7   each had in drafting and reviewing and sending the dispute --

8   the letters to Experian to determine, then, whether the

9   consumer law firm -- the Stecklein & Rapp Chartered is

10  characterized as a credit repair organization because if they

11  are deemed to be a credit repair organization, there may be

12  different obligations of Experian in responding to disputes.

13          Let me first ask Mr. McClain.  From a 10,000 feet

14  view, is that, basically, the nature of the setting of the

15  motion to quash?

16          MR. MCCLAIN:  Judge, I think you've stated it

17  accurately.  But, I mean, there is a legal dispute between the

18  parties about whether the issue of whether Stecklein & Rapp is

19  a credit repair organization, whether that has any relevance to

20  the underlying case.  We've cited a lot of cases showing that

21  it's not relevant.  The relevant inquiry is what the consumers

22  did, how involved they were in sending their dispute letters.

23          THE COURT:  All right.  Let me ask Mr. James.  Do

24  you want to flesh out that big picture that I just described a

25  little bit differently?

1          MR. JAMES:  Well, Your Honor, if I may, Mr. Sandefer

2   is going to --

3          THE COURT:  I'm sorry.  Mr. Sandefer.

4          MR. JAMES:  That's okay.

5          MR. SANDEFER:  Your Honor, I would say that, at a

6   high level, that is accurate.  That's a great portrayal of the

7   dispute here.

8          THE COURT:  All right.  And in looking at some of

9   the case law that the parties provided, it seems as though it's

10  important for Experian to determine what involvement -- direct

11  involvement the couple had, the Dulworths.  And I know that

12  Mr. Dulworth has some medical issues but may be deposed on the

13  17th.  And I see that Ms. Dulworth was deposed and asked

14  specifically about this issue.

15          And in the more generous deposition submitted in

16  document 2-4 by Mr. McClain, in reading that, it seems as

17  though she was very clear on pages 122 through -- well, let me

18  back up, 121 through 125 that this error in reporting of the --

19  I'm forgetting.  What was the item that was discharged -- that

20  was not -- that she --

21          MR. MCCLAIN:  Your Honor, it was a car loan from

22  Ally Bank.

23          THE COURT:  And that she discovered the error and

24  tried to resolve this error on her own, very frustrated, and

25  then sought out assistance.  And, according to her, she gave

the information to Stecklein.  And although she isn't familiar with the forms they used, the format, the computer programs, their mailing service, that she provided the information.  She reviewed the information.  She electronically signed the documents.  But she had to have their assistance because she was not making progress on her own.

If that is the testimony and Experian is wanting to see if Stecklein agrees with that or is -- I'm not seeing the relevancy of the incredibly broad, burdensome request that Experian is asking for Stecklein after they have deposed Ms. Dulworth, and she's provided very detailed information.

So I want to first turn it over to defense and ask what I'm missing.

MR. SANDEFER:  Sure, Your Honor.  I'm happy to provide my thoughts on that.  And there's a couple of points that I would like to make there.

THE COURT REPORTER:  Mr. Sandefer, can you pull the microphone toward you?

MR. SANDEFER:  Oh, absolutely.

THE COURT:  And you can come to the lectern.

MR. JAMES:  Do you want him to come to the lectern?

MR. SANDEFER:  Yes.

I was also going to show some documents, if that's okay, as well.

THE COURT:  Of course.

1          All right.  Yes, sir.

2          MR. SANDEFER:  Can you hear me now?

3          THE COURT:  Yes.

4          MR. SANDEFER:  Okay.  If I need to speak louder,

5    just, please, let me know.

6          As Your Honor mentioned earlier today, one of the

7    plaintiffs in this suit is incapacitated.  Although the parties

8    plan to schedule more depositions of Mr. Dulworth, he does

9    suffer from neurosarcoidosis and has seizure and memory issues.

10   It's unclear whether or not Experian will be able to receive

11   any relevant testimony from Mr. Dulworth.

12         Your Honor mentioned Ms. Dulworth's testimony.  And

13   there were some -- although she did testify as to her role,

14   there were also a number of elements which she said she had no

15   knowledge of, for example, relating to the role that CaseMail

16   played here.

17         THE COURT:  But she said she assumed they mailed it.

18   And so whether they used some program or used a person --

19   delivery or Pony Express or anyone.  I mean, I don't know the

20   relevance of that if she said she didn't mail it.

21         MR. SANDEFER:  So the language of the statute

22   here -- and it's 1681i, it's a reinvestigation claim under the

23   Fair Credit Reporting Act.  It uses the word directly.  You can

24   only invoke liability under the statute if a dispute is filed

25   directly from the consumer.  Experian's received numerous

virtually identical letters.  I can show you a few of those in
a moment, more than 100.  These -- all of the letters that I
just referenced, the 100-plus letters, later gave rise to a
1681i claim filed by Stecklein & Rapp.  And I can show you some
of these letters.  I believe that I attached one.  I have half
a dozen from different consumers here.

THE COURT:  Let's assume that Stecklein -- if I'm
saying that right -- sometimes solicits and trolls the
databases for errors, and sometimes they assertively collect
clients.  And whether they do all of the work and the clients
are just like, yeah, yeah, yeah, whatever, whatever, that 90
percent of them are in that group, but then there are some that
they have struggled with trying to get a resolution on their
own, and they see a commercial that says, We're a credit repair
organization, and we're here to help you.  You virtually don't
have to do anything.  We will take care of it.

And they call.  And they do participate in giving
information and showing all the efforts that they've made and
review the documents and sign the documents and -- but that
Stecklein uses the exact same forms, and Experian just gets a
dump of 100 forms.  90 of them the clients didn't even know
letters were sent.  And you have the 10 percent that are very
directly involved in resolving their issue.  Wouldn't you
consider those two distinct groups for purposes of your Indiana
litigation?

1       MR. SANDEFER:  Your Honor, likely so.  But what I
2   would also say is it really is a fact specific inquiry.  One of
3   the cases cited by Stecklein & Rapp in this case is *Klotz*.  I
4   believe it's an Eastern District of Pennsylvania case.  And in
5   that case, the plaintiff did play a role.  They signed the
6   form.  It was later sent out.  But they did not -- they were
7   not involved in other ways.

8           So I think you can have these situations where
9   perhaps a client reviews or signs, perhaps a client brings it
10  to the firm's attention.  Perhaps they bring one credit
11  reporting issue to Stecklein & Rapp's attention but not
12  another.  But all of these are fact specific inquiries.  And
13  it's our position that applying the language of the statute,
14  which, again, looks to whether a consumer directly participated
15  in the dispute, that's best reserved for either summary
16  judgment or perhaps even a jury to determine what role is
17  played.

18          THE COURT:  So when you say "fact specific
19  inquiries," the relevant pertinent facts would be what
20  involvement clients like Ms. Dulworth played.

21          MR. SANDEFER:  The involvement, whether it relates
22  to drafting the letter itself, to sending the letter, to whom
23  the letter was sent, the role that was played, all of that.  I
24  agree, Your Honor, that is the fact specific inquiry that I'm
25  referring to.

1          THE COURT:  So what in the world does other clients

2   who had no involvement in their letters and in the process --

3   and why in the world would you want those?  Why is that -- I

4   don't -- I don't even see it coming close.  What is your best

5   answer?

6          MR. SANDEFER:  So my best answer to that -- and Your

7   Honor may be somewhat tired of the ghostwriter analogies that

8   were in the briefs.  If you have a ghostwriter who every time

9   that they sign a contract -- for example, they say if you give

10  me a title and $10,000, I will write a book for you.  Those

11  sorts of contracts will then assist in determining the role

12  that the ghostwriter plays.

13          When it comes to the other clients -- and I'll also

14  say that to the extent that the Court is concerned about

15  burden, that's something that we repeatedly brought up to

16  Stecklein & Rapp to say, you know, if you do have issues of

17  scope, we are more than happy to eliminate or narrow topics.

18          THE COURT:  But you didn't, did you?

19          MR. SANDEFER:  Their position was that the subpoenas

20  should be quashed in their entirety.  So that was why those

21  discussions never proceeded.  It's our position that this

22  information is directly relevant because plaintiffs will need

23  to show that they directly disputed with Experian.

24          And one other note that I also just wanted to make

25  with these letters -- and, again, I have letters from half a

dozen consumers -- but this address here, 701 Experian Parkway, it's an unlisted address. It's more or less an office building. If you type it into Google, what comes up is a Google review and a MapQuest. If you go to Experian.com/dispute, it gives you a different address.

Every letter that we've received in a case filed by Stecklein & Rapp -- and I understand your concern here, which is, you know, we're -- there may be a difference between the 90 percent of consumers that are uninvolved and the 10 percent that are, but every one of these letters were sent to this unlisted address. That, to us, demonstrates -- going back to the ghostwriter example -- that there are substantial similarities across these letters and that that is evidence that Stecklein & Rapp has directly inserted themselves into the dispute process and is stepping out of.

And one other thing I also wanted to reference here. This entire dispute mechanism, it's pre-litigation. This relates to their claims of privilege. But these are dispute letters that if Experian does not respond to or does not respond sufficiently to, liability is invoked under the FCRA provision. But all of these letters that I'm referencing, again, were sent to this unlisted address that I'm not even sure if a consumer could find.

The idea that all of these letters have nearly identical language and are sent to this unlisted address

demonstrates, from our perspective, that the consumers here are
relying heavily or completely across -- across cases on
Stecklein & Rapp.

THE COURT:  Okay.  Well, that's interesting.  You
said that every letter that you've received from Stecklein has
that address.  How delayed are those letters for you to receive
them?

MR. SANDEFER:  Could Your Honor clarify what you
mean by "delayed"?

THE COURT:  Or have you not noticed any delay in
receiving the letters that are sent to this 701 Experian
Parkway?

MR. SANDEFER:  I'm -- I'm sorry, Your Honor.  Could
you rephrase?  I'm not understanding what you mean by the word
"delay."

THE COURT:  Well, I guess, one thought was if part
of Stecklein's strategy in dummying up cases and getting
damages is they do this really unhelpful address of 701
Experian that delays the process, and that's just part of their
strategy.  And that if you show a lot of letters that, yes,
this is routine strategy that they have.  It delays the
letters.  And it increases their damage or whatever.  That's
why I was asking.  Were these letters delayed in any way for a
strategic purpose of sending them to 701 Experian Parkway
that's not the best address to utilize?

1    MR. SANDEFER:  I -- I can't speak as to the strategy

2  that Stecklein & Rapp has.  There may be a manual for

3  processing these sorts of letters or sending them out.  I'm not

4  sure.

5    THE COURT:  So that isn't on your radar that they

6  may have some strategic reason for utilizing this address

7  instead of a more efficient direct address?

8    MR. SANDEFER:  Not for the reason of delay.

9  ████████████████████████████████████

10 ████████████████████████████████████

11 ████████████████████████████████████████

12 these to you.  But just to clarify -- or just to show you,

13 there's a 701 Parkway, 701 Parkway, text is virtually identical

14 across each.  These letters are transmitted, from my

15 ████████████████████████████████████

16 ██████████████████████████████████████████

17 ████████████████████████████████████

18 ████████████████████

19    As we mentioned, I believe it was in a footnote, one

20 of the biggest issues that credit reporting agencies face is

21 third party disputes that are not drafted by consumers.

22 Millions of these letters are sent.  And it is financially

23 impossible to, for example, deal with a credit repair

24 organization that sends out hundreds of thousands of letters

25 oftentimes disputing issues that have no merit.

1          THE COURT:  So your point is that if Stecklein is a

2    credit repair organization to the extent that they don't

3    involve most of their clients directly with their process that

4    they should be viewed in that manner for all of their cases

5    because it's impossible, once someone's recognized as a credit

6    repair organization that doesn't have direct processing with

7    their clients that it's too burdensome on Experian to have to

8    treat every one of these as potentially a direct participation?

9          MR. SANDEFER:  I -- I'm hesitant to speak to other

10   cases.  And I know that that's a fine line that I'm walking

11   where I'm saying that I don't want to say that this should

12   occur in every case, but, at the same time, I'm referring to

13   these general policies.

14         THE COURT:  I'm just reaching for some relevancy of

15   why you need anything besides what Ms. Dulworth and Stecklein

16   did together in you receiving a letter from -- you, your

17   client, receiving a letter from Stecklein on behalf of

18   Ms. Dulworth.  I'm just not -- I'm just trying to --

19         MR. SANDEFER:  Right.

20         THE COURT:  -- brainstorm some relevancy.

21         MR. SANDEFER:  So -- and I would almost put these

22   into two buckets.  So there are the -- to the extent that they

23   exist -- policies, testimony, things of that sort related to

24   the disputes here.  So the four disputes that were sent and

25   then invoked this liability under 1681i.  That -- with regard

1  to the deposition and document subpoenas addressed specifically

2  to those letters, I think there's a much more -- a much clearer

3  path to relevancy.  And I can have that discussion with you, if

4  you would like.

5          There is also the second bucket, which, again, is

6  where I'm referring to general retention agreements or general

7  manual or things of that sort.  That, again, where we have

8  numerous letters that are nearly identical, we believe that

9  there are these repeat processes.  These repeat processes speak

10 to the role that Stecklein & Rapp plays in every case.  If

11 there's a divergence where -- for example, Your Honor mentioned

12 there may be -- this case may differ from others, that would

13 probably fall in the first bucket.  But that second bucket we

14 still believe is relevant, which, again, that is what Stecklein

15 & Rapp, how they send credit disputes on behalf of their

16 clients.  They advertise that they assist in that process.

17         In the briefing here, they admitted to assisting in

18 it.  So it's really just a question not whether or not they

19 assist, it's to what degree.  And, again, where all these

20 letters are being sent to this unlisted address, it appears

21 that they were playing a substantial role.  As to whether or

22 not that role is enough to have the -- to absolve Experian of

23 liability under 1681, the Dulworth case, again, it's our

24 position that is more than likely going to be resolved at

25 summary judgment or perhaps trial.  But this evidence will

still -- both buckets are relevant in making that

determination.

THE COURT:  All right.  I'm just not seeing it like

you do.  It seems like you have a lot of sample similar letters

with similar procedures and mailing and similar addresses that

I guess you can make this point that --

MR. MCCLAIN:  Your Honor --

THE COURT:  -- they help a lot of clients with --

I'm just not seeing it.

MR. SANDEFER:  And --

THE COURT:  Okay.  Let me -- I'll give you a chance

to --

MR. MCCLAIN:  Sure.

THE COURT:  So you have a lot of similar documents,

same format, same terminology, phrasing, same mailing process,

same address that's a little unique of the 701 Experian

Parkway.  You already have that.  What would you gain by

getting the information -- it is such a broad subpoena request.

Number 1, all documents referring or relating to

your drafting of consumer disputes, including, but not limited

to, form or template dispute letters.  All documents referring

or relating to your drafting of consumer disputes, including,

but not limited to, form or template dispute letters.

MR. MCCLAIN:  Your Honor, and referring or relating,

there's a definition to that, too.

1          THE COURT:  Okay.  And tell me in your clearest way,

2   with different words than you've used so far, the relevancy of

3   those documents and forms and templates that are outside of

4   what was utilized with Dulworth.  Tell me what the relevancy of

5   those are.

6          MR. SANDEFER:  And you're referring to the first and

7   second?

8          THE COURT:  I was just -- number 1, all documents

9   referring and relating to your drafting of -- because that's

10  not limited to Dulworth.  That's limited to -- it sounds like

11  all.

12         MR. SANDEFER:  Right.  And, Your Honor, this is what

13  I was saying earlier about the two buckets.  And if Your Honor,

14  you know, did decide that pursuing that second bucket of claims

15  relating to these sort of procedures across cases and across

16  dispute letters for breadth or other reasons, that's something

17  that, of course, we would understand.

18         What I will say, though -- and I'm happy to, you

19  know, kind of rephrase or reclarify what I've said before.

20  Again, it's our position that here we have a lot of smoke.  We

21  have a lot of smoke with regard to the formatting of these

22  letters, to where they were addressed to, to even the way that

23  they were sent.  But here we don't have information as far as

24  the role that Stecklein & Rapp plays.  And, really, we are

25  looking at this case specifically.

1        But what -- for example, say that there was a manual

2  or that it was included in the retention agreement, that sort

3  of information would then permit us to have a better idea of

4  what occurred in this case.  I'm not sure if that clarification

5  assists at all.

6        THE COURT:  This isn't limited to a manual or

7  retention agreement.  It just says, All documents referring or

8  relating to your drafting of consumer disputes, including, but

9  not limited to, form or template dispute letters.  And they

10  said it's too burdensome, and you don't think it is.  You

11  haven't given them any relief.  And we're all here in court.

12  And I'm just asking for you to tell me the relevance of number

13  1 as to those documents and forms and templates that weren't

14  utilized in the Dulworth --

15        MR. SANDEFER:  And, again, Your Honor, I would say

16  that, you know -- and you say that they were not used.  We

17  don't know to the extent that form or template dispute letters

18  were or were not used.  None of these have been produced.

19  Stecklein & Rapp has agreed --

20        THE COURT:  But it's not limited to just Dulworth.

21  You're wanting to know all disputes.

22        MR. SANDEFER:  And --

23        THE COURT:  So why do you need to -- why are you

24  telling Stecklein that they need to turn over, I guess, the

25  whole case file, everything referring, relating to?  I'm just

1  not seeing that.  And you're here in court needing to defend

2  because you've not given them any relief through your

3  discussions of this is too burdensome.

4          Let's be more reasonable.  And if they're not

5  willing to compromise, you're not willing to, even on your own,

6  say, well, this might be a little burdensome; it might be a

7  little broad.

8          MR. SANDEFER:  And, Your Honor, my apologies if I

9  misspoke.  Our position from the beginning of this -- and we've

10 reached out to them several times -- is we were happy to

11 eliminate or narrow the scope of certain topics.  If this was a

12 discussion that we -- that we could have had, we would have had

13 it.  That's why I believe on three separate occasions we

14 reached out.  Their position each time was, though, that none

15 of this information was relevant.  It was all overly

16 burdensome.  It was all privileged.

17         THE COURT:  So what is the relevance of number 1 as

18 to John Doe, a client John Doe and how his dispute was handled?

19         MR. SANDEFER:  So my best argument, again, would be

20 that kind of having a -- knowing, for example, that there is a

21 form or template letter that is used in all cases, that would

22 assist with figuring out what happened here.  Though I'll also

23 say -- and this is where I was going earlier, if Your Honor

24 or -- or opposing counsel would want us to limit the breadth or

25 the scope, we are happy to eliminate number 1.

1          THE COURT:  That's not a good, strong position to be

2     in when you come in court that we haven't given an inch, even

3     though this -- I can't explain very well why this is relevant,

4     but I'm not -- if you want us to do something more reasonable,

5     if you order us to do something more reasonable, we will.

6     That's just not a strong, persuasive position to come into

7     court.

8          I'll let you respond again.  Let me hear from

9     Mr. McClain.

10          MR. MCCLAIN:  Judge, I think you've hit it on the

11    head.  Well, first of all, let's talk about the address, which

12    I think is sort of a red herring, but -- so we know Experian --

13          THE COURT:  And come on up to the lectern so that

14    the court reporter can hear you.  And what I'd like to know

15    is -- I'm inclined to follow your thinking as to information

16    outside of the Dulworth.  But I am curious if they -- I'll play

17    the devil's advocate.  If they took the deposition of

18    Ms. Dulworth, and they're, like, someone coached her into

19    saying this.  I want to challenge it.  Let me see what the

20    other folks in the room -- what their memory is.  How do they

21    go about challenging the process?  Is it -- what's reasonable

22    for them to -- have they deposed the -- I don't know enough

23    about this case.

24          MR. MCCLAIN:  Yeah.  So they've deposed

25    Mrs. Dulworth.  And you've read her testimony.  And

 1  Mr. Dulworth -- they started the deposition.

 2            THE COURT:  Yes.

 3            MR. MCCLAIN:  He had a seizure.  He's going to be

 4  deposed again in sort of a series of limited depositions.

 5            THE COURT:  Did they do, like, interrogatories on

 6  how was -- Stecklein, you tell us what your process -- how did

 7  she work directly in this process?  Did they get that

 8  information?

 9            MR. MCCLAIN:  So, Judge, I asked that question of my

10  client.  I was like, hey, did you guys ask any interrogatories

11  on this?  And I didn't get a response, which I'm going to take

12  that as a no, but maybe -- talk to Matt real quick.

13            THE COURT:  Okay.  So, you know, I'm just thinking

14  that, you know, if Stecklein was -- if Stecklein were asked,

15  Can you confirm what Ms. Brianna Dulworth is saying, did they

16  do that?  Or was that requested?  Or was it just simply give us

17  your whole law firm files and let us --

18            MR. MCCLAIN:  It was the subpoenas on the same day

19  as the settlement offer.  Right.

20            THE COURT:  I know you're called in here just for

21  this situation.

22            MR. MCCLAIN:  Yes, ma'am.

23            THE COURT:  What is a reasonable discovery response

24  from Stecklein to be so that they can clear up their confusion

25  or their disbelief of what Ms. Dulworth or if they're wanting

1  to confirm what Ms. Dulworth testified to?

2  MR. MCCLAIN: Judge, I just -- I don't think -- I

3  don't think they can get into the lawyers to try to get the

4  lawyers to impeach their client's testimony. I mean, I think

5  that's part of the problem of the subpoena is it raises -- this

6  raises multiple levels of conflicts for Stecklein & Rapp,

7  including, potentially, testifying against their client, being

8  disqualified as trial counsel. I mean, that's --

9  THE COURT: But if they -- Stecklein's privy to all

10  the information. And if they're saying, Hey, she testified to

11  this, but we want to confirm that. Give us all your files in

12  your law office, and let us look through everything. Seems

13  like Stecklein would say, Well, that's crazy. That's over

14  broad and burdensome and expensive. If you want us to confirm,

15  I will tell you -- I will do a declaration, this is consistent

16  with -- her testimony is consistent with what occurred. I'm

17  just trying to think outside the box.

18  MR. MCCLAIN: Right. What could we --

19  THE COURT: Why you all can't do something short of

20  coming into court and having a hearing over this.

21  MR. MCCLAIN: You know, I think you could do

22  something short of subpoenaing trial counsel, too. I mean, I

23  understand people want to test one witness's, you know,

24  recollection or testimony. But, you know what, that's a

25  witness. Sometimes you only -- you know, you're stuck with

1  what your witness says.  And she did testify exactly on the

2  points that you mentioned.  And those are the ones that are

3  directly relevant.  Under the cases -- the only relevant

4  inquiry is, as he said, it's fact specific.  It's case by case.

5  You've got to talk to the consumer to find out what they did.

6  That's your source of information, not their lawyer.

7             THE COURT:  Okay.  So then let's set aside for now

8  all the requests for anything outside of the Dulworth file and

9  process and talk about other areas that are too burdensome or

10 confidential.  It seems as though -- the first one that I see

11 is 12, all retention agreements or contracts between you and

12 plaintiffs.  I've got a little abbreviated form here that my

13 clerk prepared for me.

14            Sara, are these numbered on the memo that you

15 prepared?  Are these -- do these correspond with the request?

16            THE LAW CLERK:  Yes.

17            THE COURT:  So Number 12, the request for all

18 retention agreements or contracts between you and plaintiffs.

19 Do you object to that?  Or does your client object to that?

20            MR. MCCLAIN:  The retention agreement between the

21 Dulworths and Stecklein & Rapp?

22            THE COURT:  All retention agreements or contracts

23 between you and plaintiffs.  That may be abbreviated.  Let me

24 look at the --

25            MR. MCCLAIN:  Yeah.  There was one that asked about

1 basically for the -- I think it's another referring or relating
2 to, but I think --

3        THE COURT:  Do you have the 12 -- yeah.

4        MR. MCCLAIN:  I do.  Hang on.

5        THE COURT:  Let's look at 12.

6        MR. MCCLAIN:  Yep.

7        THE COURT:  So number 12.  Yeah.  She wrote it just
8 like it is.

9        All retention agreements and contracts between you
10 and plaintiffs.  Do you have any -- does your client have any
11 objection to turning over retention agreements or contracts?
12 Is that privileged information?

13        MR. MCCLAIN:  Between the client and -- between the
14 Dulworths and Stecklein & Rapp?  The retention agreement?

15        THE COURT:  What does -- what is 12 referring to?

16        MR. MCCLAIN:  Yeah.  It is.  It must be -- it's --
17 yeah.  All retention agreements or contracts between you and
18 the plaintiffs.  So that's between you and the Dulworths.

19        THE COURT:  Between your client and the Dulworths?

20        MR. MCCLAIN:  Yes.

21        THE COURT:  Yes.  The plaintiffs.  Okay.  And does
22 your client object to 12?

23        MR. MCCLAIN:  We do.

24        THE COURT:  On what grounds?

25        MR. MCCLAIN:  All right.  So we don't think it's

1   relevant.  And we also think -- it's just -- it's not going to

2   move the -- the contract -- the retention agreement or

3   engagement letter between Stecklein & Rapp and the clients

4   isn't going to move the evidentiary needle about what the

5   client actually did in terms of --

6          THE COURT:  Probably not.  But I wonder if that's

7   something that I could just review quickly in camera.

8          MR. MCCLAIN:  I may have it.

9          THE COURT:  Okay.

10         MR. MCCLAIN:  I may have it.

11         THE COURT:  And we don't have to do it now.  I'm

12  just trying to --

13         MR. MCCLAIN:  But, Judge, the other thing I'd say is

14  this.  So when I talked to the client about the engagement

15  letters, you know, those are confidential.  I mean, under the

16  professional -- rules of professional conduct, they're

17  confidential.

18         The other thing is, Stecklein & Rapp is concerned

19  that they -- so sometimes in engagement letters, they -- they,

20  basically, kind of explain to the clients, like, this is how

21  your case should be valued.  Right?  This is how we're going to

22  value your case.  We don't want Experian to see how we're

23  valuing our cases.

24         THE COURT:  Right.

25         MR. MCCLAIN:  And we do that -- you know, that's a

1  service to the client so they have reasonable expectations.
2  But it could be used against the Dulworths.  It could be used
3  against every other client.
4          THE COURT:  So do you think -- can you think of the
5  benefits or pitfalls of -- if those aren't very voluminous, to
6  having the Court review those and having Experian be specific
7  on what it is that is in that letter that is useful and fair
8  for them to have?
9          MR. MCCLAIN:  Again, Judge, I would say this.  Now
10 we're going to use the engagement letter to try to impeach the
11 client's testimony.  It's putting the lawyer into a conflict.
12 I mean, what you're talking about, that puts the lawyer into a
13 conflict situation.
14         THE COURT:  Well, I don't know.  I don't -- I
15 haven't seen the letter so --
16         MR. MCCLAIN:  Yeah.  No, no, no.  I'm just saying it
17 could be useful -- you're saying it could be useful to them
18 having litigated with them.
19         THE COURT:  Which, you know, that may be -- you
20 are -- your client is in the best position to brainstorm how
21 that could be improperly used or -- but I haven't seen it.
22         MR. MCCLAIN:  That's the thing.
23         THE COURT:  They don't --
24         MR. MCCLAIN:  May I ask, does the Court -- do you
25 have other cases where you're -- I mean, I know when there's a

1  fee dispute or something like that, engagement letters might be
2  produced as evidence. But in just sort of run-of-the-mill
3  civil litigation or consumer litigation, I mean, I don't think
4  I've ever in my life produced an engagement letter. We do
5  consider them confidential. And they belong to the client, you
6  know, too.

7          THE COURT: I reviewed a lot of stuff in camera.
8  That's just kind of my -- one of my default when I just don't
9  know enough about what's in the letter. I'm not clear what
10  they're hoping --

11          MR. MCCLAIN: Right.

12          THE COURT: -- to find in the letter that could be
13  helpful.

14          MR. MCCLAIN: And you've really hit it on the head.
15  I mean, the cases we cited -- because these are facially over
16  broad requests, which I mentioned on the -- on our, you know,
17  meet and confer call. Referring or relating to, what does that
18  mean. It's now their burden to demonstrate to you this is why
19  it's relevant. This is why it's not burdensome. It's not my
20  burden anymore; it's theirs.

21          THE COURT: Well, you know, I thought your
22  submission of the deposition where she testifies as to her
23  efforts before she even got to Stecklein is very different than
24  someone knocking on her door and saying, Hey.

25          MR. MCCLAIN: Yeah. No. You're right. That's the

thing. We've never disputed, yeah, we assisted with the letter, the dispute letters. That's why they hired us because she tried to do it on her own and she couldn't and failed. So she went to lawyers.

THE COURT: Right. Right. So I'm assuming the engagement letter, retention, is irrelevant based on the evidence that you've submitted to the Court and that that will just be a very quick way for me to -- if it's, like, less than 10 pages, let the Court review it. You know our position. It's confidential. It's irrelevant. And done. But I'm open to -- there's a lot of ways to skin a cat. And I'm open to suggestions and how we move this discovery dispute forward and be done with it.

MR. MCCLAIN: So, Your Honor, one reason I'm, you know, reluctant to provide anything -- you know, you saw in our brief that, you know, Stecklein & Rapp has filed 71, you know, FCRA cases, you know, since 2019. Experian has been sued 8,700 times. Jones Day is involved in a lot of those cases. They're a repeat player. If you -- if you crack this door a little bit --

THE COURT: Okay.

MR. MCCLAIN: -- it's going to be problematic not just in this case, but you're to -- your ruling is going to wind up getting trotted all over and everybody is going to -- you know, all these consumer lawyers are going to have to start

1  producing their engagement letters.

2          THE COURT:  That's valid.  That's a good point.

3          MR. MCCLAIN:  Yeah.  And when that happens, then

4  every other court with a case like the Dulworth case, they're

5  going to have all these discovery disputes about engagement

6  letters again.

7          THE COURT:  You're a good attorney.  Thank you.

8          MR. MCCLAIN:  It's a high compliment, Your Honor.

9          THE COURT:  So, then, unless they can articulate

10 what the relevant information in those retention agreement and

11 contract is, I'm influenced by your comments.

12         All right.  Is there anything in this request that

13 you think is a fair and appropriate request?

14         MR. MCCLAIN:  Judge, I'm a meet and confer person.

15 And I try to do that.  On this one, it's just facially over

16 broad.  I got an email saying, Oh, we're open to eliminating

17 topics or narrowing them, and they never did.  It's not up to

18 me to narrow it for them.  We think the whole thing is

19 inappropriate.  And I think you'd be setting a bad precedent if

20 any piece of this subpoena -- these subpoenas are allowed.

21         THE COURT:  What is Steinkamp and Associates, PC, in

22 request 13?

23         MR. MCCLAIN:  That's a -- so, you know, Stecklein &

24 Rapp is a Kansas City law firm.  And the -- the Dulworths live

25 in Indiana.  So Mr. Steinkamp is local counsel for Stecklein &

1  Rapp in Indiana.

2          THE COURT:  Who did they go to first?  Steinkamp or

3  Stecklein?

4          MR. MCCLAIN:  That's a good question.  I actually

5  don't know.  I know that they were looking for consumer

6  expertise, Mrs. Dulworth was, and she found Stecklein & Rapp.

7          THE COURT:  Okay.  But you don't know if --

8          MR. MCCLAIN:  I don't know --

9          THE COURT:  -- Steinkamp referred to --

10          This is off the record.  They can confer.

11          MR. MCCLAIN:  He thinks -- he thinks the Dulworths

12  found Mr. Steinkamp first.  And then Mr. Steinkamp contacted

13  Stecklein & Rapp because of their expertise.

14          THE COURT:  Yeah, okay.

15          And then the deposition subpoena seeks testimony --

16          One thing I didn't really understand -- and you

17  probably wouldn't understand either with the limited purpose of

18  your representation -- in the Brianna Dulworth deposition, when

19  they asked her on page 111 -- do you see the last sentence

20  where it says, quote, I have cut and pasted the wrong part from

21  the report here.  I have no idea what that means.

22          The witness says, How did I know that this was not

23  correct reporting?

24          And the question, Do you know if you or your

25  attorney cut and pasted this part of the credit report?

1          I don't remember that either.

2          MR. MCCLAIN:  Your Honor, I -- I didn't follow that

3    very well either.  Maybe the deposition questions could have

4    been a little more pointed or -- I didn't follow it.

5          THE COURT:  I mean, that could be really relevant if

6    she's correcting information.

7          I thought I read somewhere that she was clear that

8    she made her efforts before she contacted --

9          MR. MCCLAIN:  She --

10         THE COURT:  Does that sound familiar?

11         MR. MCCLAIN:  I read that.  I read those excerpts

12   this morning, the exact ones you're reading.  And that's

13   exactly what --

14         THE COURT:  Why am I not finding it?  Do you have a

15   copy of that?

16         MR. MCCLAIN:  I can look real quick.

17         We don't have the entire deposition, of course,

18   Judge.  But on 121 -- yeah, okay.  So on page 120 --

19         THE COURT:  Yes.

20         MR. MCCLAIN:  -- at the bottom, at the bottom, it

21   says:  Question:  You're alleging in this suit that Ally

22   Financial neglected to inform the credit bureaus of the

23   reaffirmation, right?

24         And she says -- and then the witness, you know,

25   says, Yes, you know, and our payments at the time wasn't even

 1  reported that we paid the payments.

 2          And then they asked about, How did you learn that?

 3          She talks about, I contacted Ally and asked them to

 4  update my reporting.

 5          All of this occurred before, you know -- well,

 6  before the dispute letters were sent.

 7          THE COURT:  Where does it say "before the dispute

 8  letters were sent"?

 9          MR. MCCLAIN:  Oh -- yeah.  So I -- I can -- I can

10  tell you that -- that that's what happened.  Ms. Dulworth tried

11  on her own, as she testified, and that those efforts were

12  before she retained Stecklein & Rapp.  We could probably get

13  additional -- we could probably go through the whole depo and

14  find that for you.

15          What we might wind up doing is sort of having to

16  compare the date of the letters that she's talking about in her

17  deposition that were exhibits with when we know that she

18  retained Stecklein & Rapp.  But that's why she was looking for

19  counsel.  She'd tried and failed.

20          THE COURT:  Okay.  It's on page 123 when they --

21  there were requests for credit reports.  And her answer was, I

22  believe both the lawyers and she -- she says, I believe both

23  requested credit reports.  I requested all of them initially.

24  And then if they did, I had to sign paperwork to allow them to.

25          MR. MCCLAIN:  Yes.

1       THE COURT:  So she had made efforts initially.

2  Okay.  So because of her efforts done initially before she

3  engaged in Steinkamp and Stecklein, I'm not seeing the

4  relevance to the deposition subpoena regarding their

5  advertisement and their soliciting customers.

6       MR. MCCLAIN:  And, Your Honor, those requests, which

7  are, you know -- those requests and deposition topics, those

8  are directed at the question of trying to explore whether

9  Stecklein & Rapp is a credit repair organization.  And under

10  the cases we cited, that's not relevant.  What is relevant is

11  what role the consumer played in the dispute letters.

12       THE COURT:  What about their position that when you

13  have some law firms that at times are clearly just soliciting

14  and are credit repair organizations but other times they're

15  not?  How do they -- it's burdensome for them to have that kind

16  of hybrid receipt of information that they can't distinguish

17  between is this a credit repair organizational letter in this

18  context, or is it a direct cooperative with the client letter

19  that appears exactly the same?

20       MR. MCCLAIN:  So I don't know -- I don't see how it

21  can be burdensome because they're supposed to open up people's

22  letters, right?  I mean, if you send in a letter to Experian to

23  dispute credit, they're supposed to open up the letters.

24  And --

25       THE COURT:  So it's just the nature of the beast, if

1  there's a --

2          MR. MCCLAIN:  I think it's their obligation.

3          THE COURT:  ██████████████████████████████

4  ████████████████████████████████████████████████

5  ██████████████████████████████████████

6          ████████████████████████████████████████

7  ██████████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10  ██████████████████████████████████

11          ████████████████████████████████████████

12  ████████████████

13          ████████████████████████████████████

14  ██████████████████

15          ██████████████████████████████

16          ████████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████

20          THE COURT:  All right.  I don't know enough about

21  it.

22          MR. MCCLAIN:  No.  And, you know, the other thing is

23  if all the letters are the same and they're all on sort of the

24  same CaseMail and they're using the same service and they're

25  the same, at some point, don't you figure out we better open

1  these up?  These keep getting sued.

2        THE COURT:  I don't know if 90 percent of them the

3  clients don't have anything to do with them, and they're just

4  different than the 10 percent.  I don't know.  Their point is

5  if the majority of them are --

6        MR. MCCLAIN:  Judge, I do want to say one last thing

7  because it's important to the client.  So they are -- you know,

8  there are -- we all know, there's lawyers out there and they

9  send dispute letters en masse.  And they're high volume filers,

10  and that's how they make their money on filing high volume

11  cases.

12        That's not Stecklein & Rapp.  They try to be more

13  selective.  They're looking for meritorious cases, like the

14  Dulworths.  And they took a lot of umbrage in the statement in

15  Experian's brief that we were sending hundreds, if not

16  thousands of dispute letters en masse because we're a dispute

17  mill.  Very offended by that and wanted me to let the Court

18  know, since they practice here, that it's not true.

19        THE COURT:  Yeah.  And I get that kind of

20  strengthens their point that if they could show more cases than

21  just this one.  Usually, it's not this direct.

22        MR. MCCLAIN:  Yeah.

23        THE COURT:  I'm just trying to imagine what their

24  best position would be to needing that information.

25        MR. MCCLAIN:  I think they would like it to be true,

 1 | but that's not true.

 2 | MR. JAMES: Can I say something, Your Honor?

 3 | THE COURT: Yes. You can respond.

 4 | MR. MCCLAIN: Getting double teamed.

 5 | MR. JAMES: You're getting double teamed. It's a
 6 | tag team.

 7 | Your Honor, Eddie James from the law firm of James
 8 | Sobba. And I'm local counsel for Experian on this matter.

 9 | I think the heart of this Court's questioning
10 | indicates that it -- you know, that what we are driving at is
11 | an essential element of the claim they are presenting in
12 | Indiana. Right? In the District of Indiana, they have to
13 | prove under this statute that they were personally involved,
14 | personally committed, personally invested, and participated in
15 | drafting these letters. That's an essential element of their
16 | claim. And that's the only discovery it seems like this Court
17 | is going to allow is the stuff that goes to an essential
18 | element of their claim.

19 | So if we look at that in the specific request for
20 | production of documents, that would be request Number 2, all
21 | documents referring or relating to your drafting of plaintiff
22 | dispute letters because we need to show -- we don't know what
23 | the -- what the role was of these two plaintiffs in drafting
24 | their letters. And we want -- we know they came from this law
25 | firm. They went through the Mailchimp platform of this law

1  firm.  So we want to know --

2           THE COURT:  Well, you already know that she has no

3  clue what forms, what applications, what format that they use.

4  She did not put pen to the paper.  She did not generate any of

5  the wording.  She wasn't sure how to word it.  That's why she

6  called them.  She has no -- she knows the folks that -- the

7  woman's name.  She's familiar with that.  They've discussed the

8  case.  She provided information.  She knows nothing about the

9  mailing.  She electronically signed.

10          MR. JAMES:  Right.  But Experian -- I didn't mean to

11  interrupt you, Your Honor.  But Experian has to convince the

12  court in Indiana that the plaintiffs have failed on that

13  essential element of their claim.  And so we have her memory,

14  foggy and incomplete, as to what they did and how they did it.

15  And the most direct testimony and documents would be what they

16  actually did, the people who actually sent the letter, put it

17  in the Mailchimp system and sent it out.

18          That's the discovery that Experian is looking for

19  because the court in Indiana -- I mean, the court in Indiana

20  right now has an incomplete picture.  I mean, she is gappy on

21  her testimony about how it was done.  So I think if -- if the

22  Court is inclined -- I think it's clearly relevant, it's not

23  burdensome, and it's not privileged to have them respond to the

24  request for production Number 2 and to the request for

25  production Number 12 involving retention agreements.

1    And the reason retention agreements would be
2  important is if the retention agreement says we intend to draft
3  your dispute letter, we intend to prepare your dispute letter,
4  we intend to send your dispute letter, and all this will be
5  covered by our engagement, that would help our case in Indiana.
6  So the -- the engagement letter is directly relevant.

7    And if they have the same -- I mean, the reason we
8  were asking for broader discovery is if they have the same
9  pattern and practice with other consumers, other engagement
10 letters, other letters they're writing, that would be good to
11 show the court in Indiana because it would show that these guys
12 are doing this over and over, and, clearly, these people aren't
13 sending this letter on their own.

14    So that's all I wanted to say, Your Honor.  We could
15 limit the deposition -- and advertising, if the advertisements
16 and the deposition topics, if the advertisements say we will
17 draft your dispute letters, we will send your dispute letters,
18 all you have to do is sign them, that is -- I mean, all you
19 have to do is DocuSign them.  They're not even signing these
20 letters.  They're DocuSigning these letters.  So that would be
21 germane and relevant evidence to a critical portion of their
22 claim.

23    And so that's why we think the discovery -- the
24 motion to quash should be denied on the deposition topics
25 relating to their work for the Dulworths, the advertising, and

1  to her engagement with the Dulworths.  And the request for
2  production, subpoena, should be allowed as to topics 2 and 12.
3          THE COURT:  I don't -- I'm still not seeing it.  If
4  their retention agreement says we will help draft your letter,
5  we know, you know, how to articulate it, we'll even mail it for
6  you, so what?  She said, Yeah, that's what they did.  I gave
7  them the information.  They utilized the words.  I reviewed,
8  and it was correct.  And I signed it.  And they mailed it.
9  You've got that.

10         The only thing that there's gaps in is stuff that
11 helps her.  The stuff that hurts her, it's locked in.  She's
12 got the letter.  You got the letter.  She says, I didn't write
13 the letter.  I didn't put pen to paper.  I didn't have anything
14 to do with the mailing.  I don't know how they got that
15 address.

16         MR. JAMES:  Right.  But if -- if -- we don't know
17 what the engagement letter says.  We don't know what the
18 retention letter says.

19         THE COURT:  What if it says we intend to draft your
20 letter and mail it, and we'll suggest wording if you don't know
21 how to articulate the legal request that you're making?

22         MR. JAMES:  And that's -- that would be a question
23 to put before the Indiana court, whether that carries their
24 burden under the statute if that's what the letter says they're
25 going to do.  I mean, that's -- that's the burden they have in

1  Indiana, not our burden, not the burden of Experian, but it's

2  their burden as the plaintiff in Indiana to show that they

3  submit -- the consumer submitted the letter.  Okay.

4          THE COURT:  Okay.  And so how do they show that?

5  Through the attorneys testifying in court or through the party?

6          MR. JAMES:  Well, no, it -- we took the deposition

7  of the party, and she was -- she was less than clear.  And you

8  think, well, she might -- from your perspective, she was clear,

9  but not all judges think the same.  And we want the judge in

10 Indiana to be fully convinced that she did not draft, did not

11 submit, and did not create and deliver that letter.

12         And so that's why Experian -- when I first saw this,

13 I saw discovery in a law firm, I said, What are we doing?  I

14 mean, that was my -- I mean, this is an unusual situation, Your

15 Honor.  I concede that.  But the information we are asking for

16 is an essential element of their claim.  And that's why it's

17 germane, relevant, and it's pre-litigation.  It's when they're

18 submitting notice to Experian that there's a problem and for

19 Experian to solve it.  It's not a -- it's not a privilege

20 issue.  It's not a work product issue.  So I know he's already

21 addressed all that, but I wanted to come up and put in my local

22 counsel two cents.

23         THE COURT:  Thank you.

24         Mr. McClain, what if that engagement letter and that

25 contract isn't so, you know, let us draft your letter, let us

1 use our magic words, and you just relax, we'll do everything?

2 What if the engagement letter isn't that way? What if it's

3 just a sincere, just normal engagement letter? I review it,

4 and I make an order that, out of abundance of caution, this is

5 being reviewed. This should have never -- as plaintiff argued,

6 this is irrelevant. It should never be disclosed in discovery

7 in future cases. This is -- they were right on target with

8 their position.

9          Does that help you? And does that actually give you

10 more -- or your client more authority in the future that other

11 judges have bent over backwards for them, and this just isn't

12 relevant? And this judge says I confirmed how irrelevant their

13 request is.

14          MR. MCCLAIN: Right. Your Honor, if you want to do

15 your fellow judges a favor, I would quash the subpoenas because

16 we open that door a crack, and every other consumer lawyer is

17 now at risk of having to produce their engagement letters.

18 That's one reason why I'm reluctant, unless the relevance is

19 clear.

20          The other thing -- the reason I -- part of the

21 reason I think it's -- it's not just that it's confidential

22 and what -- it doesn't really matter what's in the engagement

23 letter, it matters what actually happened, what the witness --

24 what the client or the plaintiff actually did --

25          THE COURT: Yes.

1        MR. MCCLAIN:  -- right?  It doesn't matter what the
2   letter says.  It's what she testified to under oath.

3        THE COURT:  I agree.  I'm just trying to think out
4   of the box, you know, to just lay this to rest.  And we're not
5   having to take up court time when these engagement letters
6   should not be disclosed in discovery.  And if you had an order
7   that, yeah, a judge actually did take a peek, and it has no
8   merit in discovery requests.

9        MR. MCCLAIN:  Judge, it won't -- won't stop more
10  requests.

11        MR. SANDEFER:  Your Honor, can I take a quick --
12        THE COURT:  Yes.

13        MR. SANDEFER:  I just wanted to make two very brief
14  points.

15        THE COURT:  Yes.

16        MR. SANDEFER:  So the first is Your Honor is -- and
17  much of the discussion recently has revolved around Brianna
18  Dulworth.  Again, there are also questions that remain as to
19  Craig Dulworth, his memory.  And second to that, there has been
20  a lot of briefing in the Indiana court about whether he is fit
21  for another deposition.  But he has substantial memory problems
22  remembering things from even a few years ago.  As far as
23  whether or not he will be able to remember his role here,
24  that's unclear.

25        So putting, kind of, Brianna Dulworth aside and

1 whatever lack of clarity was -- occurred with regard to her

2 deposition, it will likely be much, much greater with regard to

3 Mr. Dulworth's deposition. So that's where things like the

4 engagement letter may be especially relevant.

5 I also want to mention -- and opposing counsel has

6 made this point a couple of times about how this would crack

7 open the door. There is another case we cited in our response.

8 It's *Cardinali* in the District of Nevada where a similar

9 situation occurred. A law firm was drafting and sending

10 letters on behalf of consumers. And the Court ended up

11 allowing both deposition -- depositions to occur of their

12 counsel as well as several document productions. I believe --

13 I don't have the orders in front of me. But I believe that did

14 include the retention agreement.

15 So there is a case out there that has already

16 cracked open the door with similar facts where opposing counsel

17 was functioning as a credit repair organization. And to the

18 extent that Your Honor has concerns about that, again, that's

19 been contemplated by other courts. Other courts have dealt

20 with the same sort of issues and permitted that discovery to

21 occur.

22 THE COURT: I'm assuming the Dulworths are a married

23 couple?

24 MR. SANDEFER: Yes. Yes, Your Honor.

25 THE COURT: And did they utilize Stecklein for

1 information besides the payments of the car loan that

2 Ms. Dulworth actively testified she actively participated in?

3 Are there other errors that only Mr. Dulworth dealt with?

4      MR. SANDEFER:  I believe that the suit related to

5 this account appearing on both of their credit reports.  So

6 they both have, I guess, a 1681i claim against Experian for the

7 alleged error that occurred on both of their reports, but it

8 relates to the same account.  I believe it was a joint account.

9      THE COURT:  And is it more than the car payments

10 that Ms. Dulworth was working on before she got Stecklein

11 involved?

12      MR. SANDEFER:  I do not know, Your Honor.  Aside

13 from that one page of deposition testimony where she seems to

14 have discussed her actions with regard to the Ally Financial --

15 or with regard to Ally Financial.  Also, I want to note that

16 that deposition testimony was related to a correspondence she

17 had with Ally Financial, not Experian.  So with a furnisher,

18 not a credit -- or not a credit -- not a CRA, like Experian.

19 But I'm not sure if she had any other contact or had any other

20 issues to resolve.

21      THE COURT:  Okay.  Without that, I'm not persuaded

22 by the need to know the details of Mr. Dulworth's involvement

23 if -- or none -- maybe none.  Maybe he just walked in there

24 with her and signed what she told him to sign because she had

25 reviewed it for her husband.  So outside -- if it's different

1  than that, let me know because that would possibly change

2  things.  But if you don't know, then that's not -- doesn't

3  change anything regarding Mr. Dulworth.  I just don't see the

4  relevance if she's making all these efforts on behalf of them

5  both if he didn't work directly with it, how that --

6         MR. SANDEFER:  Right.  And part of it is, you

7  know -- and, again, to the extent it's a fact specific inquiry

8  that's looking to the role the consumer played, we do not know

9  what role Mr. Dulworth played.  And, again, it's unclear if we

10  will be able to obtain any information regarding what role he

11  played in drafting or sending those disputes.  Unlike with

12  Brianna Dulworth's testimony, which is before the Court, we may

13  not be able to get similar testimony from Mr. Dulworth in these

14  limited depositions that are set to occur.

15         THE COURT:  So are they both seeking separate

16  damages, I guess?

17         MR. SANDEFER:  I would have to defer to plaintiff's

18  counsel or opposing counsel.

19         THE COURT:  I guess -- I don't know what the law is

20  in this area if one husband doesn't have a direct

21  involvement -- one spouse doesn't have a direct involvement but

22  the other spouse does on behalf of both of them.  Does that

23  negate the husband having direct involvement because he had his

24  wife do it for him?  Is there case law --

25         MR. SANDEFER:  Not that I'm aware of.  I imagine

1 some of these may have to be resolved at summary judgment.

2 But, again, I think what's especially relevant here and what

3 we're trying to figure out is whether or not he or Stecklein &

4 Rapp drafted these letters played a direct role in the dispute

5 process.

6 For example, I -- I'm not expecting to be able to

7 get testimony from Craig Dulworth regarding the role that he

8 took in drafting or in communicating issues to his attorneys or

9 in researching the dispute, any of that material.

10 THE COURT: Okay. Anything further?

11 MR. SANDEFER: Nothing further.

12 THE COURT: All right. Mr. James, do you have some

13 enlightening information for us? Is it Mr. James? Is that

14 right?

15 MR. WEYHOFEN: Weyhofen.

16 THE COURT: Okay. I've got this backwards. You're

17 Weyhofen.

18 MR. WEYHOFEN: Yes.

19 THE COURT: Do you have any enlightening information

20 for us?

21 MR. WEYHOFEN: Just two things I'd like to add

22 briefly, Your Honor.

23 THE COURT: Come on up to the lectern. I'm sorry.

24 You're Mr. James, local counsel.

25 MR. JAMES: Yes, Your Honor.

1          THE COURT:  I've got this backwards.  I apologize.

2          MR. WEYHOFEN:  So just two things I want to add

3    briefly.  It won't take long.  So opposing counsel referenced

4    the *Cardinali* decision from the District of Nevada.  One thing

5    that I think is very important to point out here is that was a

6    class action.  So it would arguably make more sense to get more

7    information from potential class members, whereas here you're

8    dealing with a husband and wife.  It's two plaintiffs.  So

9    that's the first point.

10         And then -- let me see here.  And to answer your

11   question about whether or not they would be recovering or

12   seeking to recover damages on behalf of both of them, they

13   filed a joint bankruptcy.  So the information that they were

14   contesting was in regard to an auto loan that they reaffirmed

15   through that joint bankruptcy.

16         All right.  Nothing further.

17         THE COURT:  All right.  And so if he did nothing and

18   only his wife coordinated with Stecklein, does that help their

19   case in any way as long as his wife, on his behalf, coordinated

20   with Stecklein in trying to resolve the error?

21         MR. WEYHOFEN:  No, Your Honor.  So the case law we

22   point out in our briefing demonstrates that you can have a

23   family member, you can have assistance from a third party, as

24   long as you meaningly participate in the dispute process.  So

25   the fact that Brianna did it on behalf of Craig, as long as

1  Craig was there, he was participating with Brianna.  That's the

2  end of the inquiry.

3        THE COURT:  Okay.  Have you read the whole

4  deposition of Brianna or just the excerpts?

5        MR. WEYHOFEN:  Yes, Your Honor.  So I'm -- I am

6  Dan's associate, so he had me reading that thing up and down

7  multiple times.

8        THE COURT:  The whole deposition?

9        MR. WEYHOFEN:  Yes.

10        THE COURT:  Okay.  Was the husband with her in the

11  meetings with Stecklein and -- I can't remember who the woman's

12  name was?  Do you know what the full deposition said?  Or did

13  they maybe not ask that?

14        MR. WEYHOFEN:  I cannot recall, Your Honor.

15        THE COURT:  Okay.  Okay.  I'm not seeing -- are

16  there other issues, Mr. Sandefer, in the request that we

17  haven't touched on that you believe are relevant that you'd

18  like to discuss?  Because when I'm looking through there, these

19  lists, all my rulings are to quash.  So I just want to make

20  sure I'm not missing something that I shouldn't be missing.  Is

21  there something that we need to talk about?

22        MR. SANDEFER:  Your Honor, just as we discussed --

23  or as Eddie discussed earlier, 2 and 12, both with regard to

24  the retention agreement and the drafting of plaintiffs' dispute

25  letters, we believe that those are -- I refer -- earlier today,

1  I referred to different buckets, those related directly to the

2  Dulworths and those not.  Those are ones that I believe are

3  directly related to the Dulworths.

4          Also, with regard to the deposition topics, there's

5  also one specifically that, again, falls in that same bucket,

6  which is the role in submitting plaintiffs' dispute letters.

7  It's -- it's -- yeah.

8          THE COURT:  And who is it that you want to depose?

9          MR. SANDEFER:  So it would be someone on behalf of

10  Stecklein & Rapp, a 30(b)6 --

11          THE COURT:  A designated officer, director, or other

12  person --

13          MR. SANDEFER:  And it does not have to be an

14  attorney.

15          THE COURT:  -- competent to testify on behalf of S &

16  R.

17          All right.  My inclination -- and I want to give

18  Mr. McClain an opportunity to counter my thoughts, or

19  Mr. Weyhofen -- to submit documents in 2 and 12, which is the

20  retention agreement and contracts, for in camera review.  And

21  if someone from Stecklein can generally describe the role in

22  submitting plaintiffs' dispute letters, the role Stecklein

23  played in submitting plaintiffs' dispute letters in camera.

24          And I'm assuming that none of that information is

25  appropriate discovery for the law firm to have to normally

1  disclose, but out of abundance of caution to have that review

2  done.  But then it may generate an order that can be utilized

3  in the future by -- I'm assuming it may be the law firm that it

4  is irrelevant and inappropriate for a few reasons to be

5  discoverable.

6          I know your comment that it's a slippery slope, and

7  you don't want to start in that direction.  What other things

8  am I missing of pitfalls to doing that?

9          MR. MCCLAIN:  Yeah.  So on request Number 2, first

10  of all, I don't think an attorney should be testifying on this

11  topic.  I mean, a depo topic, you know, we don't -- we object

12  to that for all of the reasons in our briefing, including that

13  it's necessarily going to implicate attorney-client

14  communications.  Right?  Because Mrs. Dulworth testified, lots

15  of communications back and forth with them.  All right.

16          On request Number 2, we get into all documents

17  referring or relating to your drafting of plaintiffs' dispute

18  letters, including, but not limited to, draft versions.  So in

19  the Indiana case, Stecklein & Rapp is going to produce the

20  drafts of the -- of the dispute letters.  Those are going to be

21  produced in discovery.  I don't know --

22          THE COURT:  So they will already be --

23          MR. MCCLAIN:  Yes.  And I don't know what else they

24  need beyond that.  And I don't understand what they're asking

25  for, referring or relating to your drafting.

1          THE COURT:  Comments that -- corrective comments you

2    may have made.  Like if she sent an email, when do I get to

3    come in and review the document?  When do I -- something like

4    that?  I'm just trying to brainstorm, communications

5    reflecting --

6          MR. MCCLAIN:  That's the thing.  You and I are both,

7    sort of, like, speculating about what they're asking for

8    because they use facially overbroad language.  I mean, that's

9    what I'm saying.  Like, I don't know what they're asking for.

10   We're producing the dispute letters.  I think that should be --

11   drafts of the dispute letters.  That should be sufficient, I

12   would think.

13         And the engagement letter, I've already, you know,

14   said my piece, including that it doesn't matter what the

15   engagement letter says.  It matters what the witness says, what

16   actually happened.

17         THE COURT:  She said she gave them information.  I

18   don't know if they asked, Did you submit any documents?  Was it

19   just oral?

20         MR. MCCLAIN:  So I don't remember in her deposition

21   whether she was asked to identify -- I mean, I -- you know,

22   some of this is cleaning up from a deposition that maybe could

23   have been done differently.  Right?  And I don't remember

24   whether she was asked about what information she gave them.  I

25   just don't remember.  I know she said, I'm the one who found

1  the error.  I gave them the information.  I don't know what it

2  was myself, Judge, but I'll bet it's been produced, if it's

3  written, in written format.

4          THE COURT:  All right.  And then I've already

5  addressed 12.

6          And then 4 is similar to, if it's not an attorney.

7  A paralegal would probably fit in that same --

8          MR. MCCLAIN:  Sorry.  Are we talking about --

9          THE COURT:  Deposition.

10         MR. MCCLAIN:  -- 4.

11         THE COURT:  What was -- to have someone from

12  Stecklein describe the process, I guess, confirming what the

13  victim -- the victim -- the plaintiff says.

14         MR. MCCLAIN:  She was a victim but --

15         THE COURT:  Just come off two days of criminal.

16         MR. MCCLAIN:  If I could just ask Mr. --

17         THE COURT:  Of course.

18         MR. MCCLAIN:  Judge, what we're doing is you asked

19  earlier whether there was other form of discovery they'd been

20  asked about, you know, how the letters were prepared.

21         THE COURT:  Yes.

22         MR. MCCLAIN:  And I asked for interrogatories.  He

23  may have the interrogatories.  So we're just looking to see if

24  there's anything --

25         THE COURT:  All right.  Is there any objection for

1  the attorney with Stecklein to advise the Court on -- or if you

2  know, I guess, you could advise on what discovery has already

3  been specifically or more specifically requested regarding 2?

4          MR. SANDEFER:  Referring to number 2?

5          THE COURT:  It's documents referring or related to

6  your drafting of plaintiffs' dispute letters, including, but

7  not limited to, draft versions.  And Mr. McClain believes that

8  that has already been requested probably in some other

9  subpoena -- some other document request and that you would be

10  getting those through some other request.

11          MR. SANDEFER:  So -- and I can speak up or go to the

12  podium, whichever is better.

13          THE COURT:  Come on up to the lectern.

14          MR. SANDEFER:  Sure.  So opposing counsel is correct

15  that Stecklein & Rapp, a couple weeks ago -- and I'll hand this

16  back to -- that opposing -- that Stecklein & Rapp has agreed to

17  produce draft dispute letters.  I think we refer to those in a

18  footnote.  Those draft dispute letters are -- they apparently

19  differ as to attachments and things of that sort.  That's the

20  only document that I'm aware of that they have referenced here.

21          But I'm not sure if there is -- if there are any

22  other documents.  Your Honor mentioned communications or other

23  documents or emails, whatever, that may refer to or clarify

24  plaintiffs' role, either Brianna Dulworth's or Craig

25  Dulworths's role, in the dispute letters or whether there are

1  review comments or edits made or anything along those lines.

2          THE COURT:  All right.  Anything further?

3          MR. SANDEFER:  Nothing further from us.

4          THE COURT:  Mr. McClain, anything --

5          MR. MCCLAIN:  Judge, I was just going to say,

6  there's emails from the client saying change this or I'm

7  concerned about this.  Aren't those privileged?  I mean,

8  they're consulting with a lawyer about their discovery

9  responses in the case seeking -- I would imagine seeking

10 guidance.  So I feel like all this stuff, we're just -- now

11 we're getting into privilege issues on top of everything else.

12         MR. SANDEFER:  And just to clarify -- and this has

13 been our position from the get-go -- we are not looking for any

14 information after the case has been filed.  We are not looking

15 for privileged information.  We are strictly looking at

16 documents and testimony regarding the role that Stecklein &

17 Rapp played in this pre-litigation process of drafting,

18 sending, authoring dispute letters on behalf of clients.

19         So we're -- we're not looking for communications

20 after the case was filed.  We're looking for, again, strictly

21 those documents that may be related to the dispute letters

22 themselves.

23         THE COURT:  And how is -- documents that the

24 Dulworths may have provided to Stecklein, how is that

25 privileged --

1          MR. MCCLAIN:  So --

2          THE COURT:  -- if that's utilized in --

3          MR. MCCLAIN:  Yeah.  That's what I'm saying.

4          THE COURT:  -- the letter?

5          MR. MCCLAIN:  I would imagine that all that's

6  already been produced.  You know, like, the credit report --

7  the -- how do you call it, the -- the erroneous credit report

8  that she caught, the information she found that alerted her

9  that there was -- I mean, all that -- I think some of it is

10  attached to the subpoenas.  I think it's all been produced

11  already.

12          THE COURT:  All right.

13          Okay.  Mr. Weyhofen, do you want to weigh in one

14  more time?

15          MR. WEYHOFEN:  Nothing further, Your Honor.

16          THE COURT:  Okay.  I'll get an order out -- I want

17  to just mull over it a little bit to see what the exact

18  contours are, but the -- I will quash at least everything at

19  this point, but I want to think about the document request

20  Number 2 and Number 12 and possibly the deposition subpoena 4.

21  I want to think about those three areas.

22          If you want to also think about it and submit an

23  email or something formal, ECF filing, an email to Sara Skelton

24  or ECF filing, I'll take a look at that.  If you need a day or

25  two -- we could try to get an order out by close of business

Friday. Today is Wednesday. So that would give everybody a day or two to submit some final thoughts.

        I'm very slow in civil, so you all are getting punished for asking me to weigh in on this. All right.

        MR. MCCLAIN: We appreciate it, Judge.

        MR. JAMES: Thank you, Your Honor.

        MR. SANDEFER: Yes. Thank you.

        THE COURT: All right. Have a good evening.

        (Proceedings concluded at 3:21 PM)

                        * * * * *

                        CERTIFICATE

    I certify that the foregoing is a correct redacted transcript from the record of proceedings in the above-entitled matter.

May 30, 2023


                        /s/Jean M. Crawford
                        JEAN M. CRAWFORD, RDR, CRR
                        United States Court Reporter